FILED IN CLERK'S OFFICE
U.S.D.C. - Atlanta

JUN 1 6 2004

LUTHER D. THOMAS, Clerk
By: _____ Deputy Clerk

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

SECURITIES AND EXCHANGE
COMMISSION,

      Plaintiff,

v.

J. SCOTT ESKIND; LORUS
INVESTMENTS, INC.; and
CAPITAL MANAGEMENT FUND,
LIMITED PARTNERSHIP,

      Defendants.

**ORIGINAL**

Civil Action No. 1-02-CV-2429-MHS

**SPECIAL MASTER'S MOTION FOR (A) AUTHORITY TO
SELL RESIDENCE OF J. SCOTT ESKIND FREE AND CLEAR OF LIENS;
(B) TO DETERMINE SECURED CLAIM; (C) TO SURCHARGE
COLLATERAL OF MORTGAGE HOLDER; AND (D) REQUEST FOR
HEARING THEREON PRIOR TO JULY 30, 2004**

COMES NOW, S. Gregory Hays, the duly authorized and acting Special

Master herein, by and through his undersigned counsel, and, in support of his

Motion for (A) Authority to Sell Residence of J. Scott Eskind; (B) to Determine

Secured Claim (C) to Surcharge Collateral of Mortgage Holder and (D) for

Hearing thereon prior to July 30, 2003 and shows as follows:

**PROCEDURAL AND FACTUAL BACKGROUND:**

    1.    On January 20, 2004, this Court entered its "Final Judgment Including

Order of Permanent Injunction and Other Relief" (the "Final Judgment"). Pursuant

ATLANTA:4652753.1

to the terms of the Final Judgment, this Court appointed S. Gregory Hays as Special Master for, *inter alia*, the purpose of administering and liquidating certain assets of the Defendants and formulating a plan of distribution for the proceeds of such assets. Article XII of the Final Judgment expressly permitted the Trustee to apply to this Court for such powers as might be necessary to efficiently administer and manage the assets turned over to him.

2.    Pursuant to Paragraph VI of the Final Judgment, Defendant Eskind and his wife, Jennifer C. Eskind, were required to transfer to the Special Master their Residence at 1184 Dawn View Lane, Atlanta, Georgia 30327 (the "Residence"). In accordance with the Final Judgment, Defendant and Mrs. Eskind did subsequently deliver title to the Residence to the Special Master.

3.    Prior to the entry of the Final Judgment, this Court entered an Order on September 12, 2002 which, *inter alia*, provided for a freeze on Defendant Eskind's assets. This Order was supplemented on November 6, 2002. On June 30, 2003, the United States of America instituted a forfeiture action against the Residence styled: *United States of America v. 1148 Dawn View Lane, Atlanta, Fulton County, Georgia 30327, and all Buildings and Appurtenances Thereon;* United States District Court for the Northern District of Georgia; Civil Action File No. 03-CV-1819 (the "Forfeiture Action") and a lis pendens was filed by the United States of America shortly thereafter with respect to the Residence. The

-2-

Special Master is informed and believes that the Forfeiture Action was stayed, in part, due to the entry of the Final Judgment and its requirement that title for the Residence be tendered to the Special Master.

4.      Paragraph VI of the Final Judgment directed the Special Master to file his recommendations for the liquidation of Defendant Eskind's property and to provide an estimate as to the equity in the Residence. The amount of equity in the Residence was to be credited against the disgorgement obligations of J. Scott Eskind as set forth in the Final Judgment.

5.      On March 8, 2004 the Special Master filed his Status Report and Recommendations with this Court wherein the Special Master reported that he had taken possession of and title to the Residence and had signed a listing agreement with Harry Norman Realtor to market and sell the Residence at a price of $1,050,000. The agreed-upon commission to be paid to Harry Norman Realtors was 6% of the sales price. Since filing his Status Report, however, and in accordance with recommendations received from Harry Norman Realtors, the Special Master reduced the list price, first, to $979,000 and, second, to $949,000.

6.      The Residence is encumbered by a mortgage entered into by Jennifer C. Eskind as "Borrower" and Emigrant Mortgage Company ("Emigrant") as the Lender on May 13, 2002. At present, the Special Master does not have any information regarding payments made in connection with the mortgage, except for

-3-

a letter dated February 25, 2004 from counsel for Emigrant which asserts that the payoff amount for the mortgage as of February 15, 2004 was $852,727.57, with interest continuing to accrue at the rate of $339.46 since that date.  A true and correct copy of this letter is attached hereto as Exhibit "A".  According to this letter, Emigrant is seeking to collect interest at the rate of eighteen percent (18%) per annum on the principal balance due of $678,924.28, which rate of interest is the default rate of interest as opposed to the contract rate of interest of 6.75% provided for in the mortgage agreement.  According to the letter, Emigrant has accrued interest at this rate since November 1, 2002, which was after the initial Freeze Order was entered against the Residence and is continuing to seek default interest through and after the Forfeiture Action.  In addition, the pay-off amount includes substantial late fees and penalties which may have accrued before and after the Freeze Orders.  The Special Master is also informed and believes that Emigrant commenced foreclosure proceedings against the Residence in 2003 which it subsequently halted.  To the best of the knowledge, information and belief of the Special Master, Emigrant has not appeared in either this action or in the Forfeiture Action to pursue its rights with respect to the Residence and has not taken any other action to preserve or protect its interests with respect to the Residence.

ATLANTA:4652753.1

7. The Special Master has received an offer to sell the Residence for a price of $930,000 in accordance with the contract attached hereto as Exhibit "B" and incorporated herein by reference (the "Offer"). As part of the transaction, the Special Master is required to pay closing costs of $10,000. Harry Norman Realtors has advised the Special Master to accept the Offer and the Special Master has accepted the Offer subject to approval from this Court.

8. In his Status Report and Recommendation filed on March 8, 2004 which assumed that the Residence would be sold for $975,000 and that the pay-off to Emigrant would be $852,727.57, the Special Master estimated that approximately $28,000 in equity would be available from the Residence. As set forth in the Status Report, however, the Special Master had notified Emigrant that the Freeze Orders prohibited the increased interest charges and that interest would be paid at the contract rate only. Based upon his further investigation of the Emigrant Mortgage, the Special Master believes that Emigrant's attempt to recover interest at the default rate is improper and should be disallowed.

9. The Special Master has advised Emigrant that he will pay Emigrant the full principal amount owed to them, interest at the contract rate and reimbursement of all other expenses which Emmigrant has advanced in connection with the Residence. The Special Master has informed Emigrant that he does not believe the imposition of default interest and charges for late fees are equitable or

-5-

in accordance with the prior actions taken to "freeze" the Residence pending resolution of the lawsuits against Mr. Eskind. Moreover, the Special Master has incurred substantial expenses in taking possession of the premises, marketing the property for sale and complying with duties assigned to him in the Final Judgment. Emigrant has rejected this proffer from the Special Master and has advised the Special Master that it will insist upon payment of interest at the default rate and payment of late fees and charges.

10. The Special Master is informed and believes that Buckhead Turfcare LLC has filed a Materialman's Lien against the Residence with Clerk of the Superior Court of Fulton County on October 24, 2003 (the "Lien"). The principal amount of the Lien is $899.31.

11. Assuming that (i) the Lien is fully satisfied; (ii) the Broker's commission paid and (iii) Emigrant is paid the full principal amount owed to it, interest at the contract rate and reimbursement of its out of pocket expenses, the Special Master estimates that the Residence will generate equity of $50,000 to $60,000 to ultimately be disbursed to the creditors of Defendant Eskind. If Emigrant is permitted to charge interest at the default rate and to recoup its late fees, the transaction could result in a net loss to Mr. Eskind's creditors and a windfall to Emigrant which has done little or nothing to protect its interests in this matter.

ATLANTA:4652753.1

## RELIEF SOUGHT

### A.    To Sell the Residence:

12.    The Special Master requests that this Court grant him the authority to sell the Residence pursuant to the terms and conditions contained herein and in Exhibit "B" and to execute such documents as may be necessary to effectuate such transaction and to otherwise take such actions as may be necessary to effectuate such transaction.

13.    With respect to the Broker, the Special Master requests authority to pay the broker the six percent commission specified in the Listing Agreement from the proceeds of the sale.

14.    With respect to the Emigrant Mortgage, the Special Master requests permission to pay Emigrant (a) the full principal amount owed to it; (b) interest at the contract rate of 6.75% from November 1, 2002 until paid and (c) reimbursement of its out of pocket expenses as set forth in Exhibit "A" in full and final satisfaction of any lien or mortgage it may have against the Residence.  In the event that Emigrant does not consent to be paid interest at the contract rate, the Special Master requests that he be permitted to sell the Residence free and clear of any lien, claim or encumbrance of Emigrant with such lien or claim to attach the proceeds of the sale, after payment of the Broker's commission, to be held in escrow pending determination of Emigrant's claim as set forth below.

15. With respect to the Lien, the Special Master requests authority to satisfy the Lien from the proceeds of the sale of the Residence.

**B.  To Determine the Amount of the Emigrant Claim:**

16. Emigrant is seeking default interest on the principal balance owed at the rate of eighteen per cent per annum since November 1, 2002. The Special Master is informed and believes that November 1, 2002 is when the Emigrant Mortgage first went into default. On September 12, 2002, this Court entered its first Freeze Order. The Special Master asserts that any attempt to impose default interest after that date would be improper and would further be prejudicial to the other creditors of Mr. Eskind. Accordingly, the Special Master requests that this Court limit Emigrant's secured claim to include the (i) principal amount due, (ii) interest on the principal amount due from November 1, 2002 at an annual rate of 6.75% only until the date the claim is paid; and (iii) amounts advanced for insurance and taxes and other out of pocket expenses listed in Exhibit "A". The Special Master further requests that this Court specifically disallow any claim for default interest or for late fees or other similar charges assessed since November 1, 2002.

**C.  To Surcharge Emigrant's Collateral:**

17. Since taking possession of the Residence, the Special Master has incurred expenses, both in the form of out of pocket expenses and professional and

-8-

attorney time in addressing issues related to the Residence. Indeed, these actions have resulted in the preservation of the Residence largely for the benefit of Emigrant. To the best of the knowledge, information and belief of the Special Master, Emigrant did not undertake any action to protect or preserve the Residence or incur any of its own expenses in doing so. Thus, creditors of Mr. Eskind, through the actions of the Special Master, have substantially benefited Emigrant and they should be compensated from the proceeds of any sale. The Special Master will calculate the amount of such claim at the time the sale of the Residence is closed.

### D.    For a Hearing:

18.    The terms of the Offer require the Special Master to close this transaction on or about July 30, 2004. Moreover, the Special Master is advised and informed by Emigrant that it will insist upon receipt of interest at the default rate and imposition of late fees and charges. Accordingly, the Special Master requests that this Court conduct a hearing with respect to the relief sought in this Motion on or before July 30,2004 and that it conduct a show cause hearing on or before that date with respect to the relief sought in that Motion. A proposed Order to Show Cause is attached hereto as Exhibit "C" and incorporated herein by reference.

ATLANTA-4652753.1

-10-

WHEREFORE, the Special Master respectfully requests that he be granted the relief requested herein and for such other and further relief as may be deemed just and proper.

Dated:   June 16, 2004.

MCKENNA LONG & ALDRIDGE LLP

BY: _____
Henry F. Sewell, Jr.
Ga. Bar I.D. No.  636265

303 Peachtree Street , Suite 5300
Atlanta, Georgia 30308
(404) 527-8120
Attorneys for the Special Master

-10-



# EXHIBIT / ATTACHMENT



(To be scanned in place of tab)

# Richard A. Epstein

**Attorney at Law**
2 Bucks Lane & Hwy 79, Suite 3
Marlboro, N.J. 07746

732-303-8599

Admitted to the Bars of
New Jersey and New York

February 25. 2004

29-53 Butler Street
East Elmhurst, New York 11369

Facsimile:732-303-1566

Via Facsimile

Scott Askue
Hays Consulting
3343 Peachtree Road, Suite 750
Atlanta, GA  30326

Re:  Emigrant Mortgage Company v. Eskind
     Mortgage No. 466812-0
     Premises. 1184 Dawn View Lane, Atlanta, Georgia

Dear Mr. Askue:

Confirming our telephone conversations. I am New Jersey counsel for Emigrant Mortgage Company. which holds the first mortgage on the referenced premises owned by Jennifer Eskind.

As per your request, attached is a payoff statement for my client's mortgage on the property. with figures good through February 15. 2004.  When you have a specific date for payoff of the loan, please contact Patricia Gilligan at Emigrant Mortgage Company (212-850-4595) for an updated payoff figure.

Based upon my conversations with you and Gregory Hays, the Special Master appointed by the Court. I understand that your office is in the process of listing the property for private sale. It is my further understanding that the Special Master recognizes Emigrant's first mortgage position on the property. and that our loan will be paid in full upon a sale of the property. assuming a sale price in excess of the mortgage amount. If this understanding is incorrect, please advise me immediately. so that we can take whatever steps are necessary to protect Emigrant's lien priority on the property.

In addition. we would appreciate your advice when a contract for sale is executed.

Thanking you for your prompt attention to this matter.

Very truly yours,

Richard A. Epstein

cc:  Emigrant Mortgage Company
     (Attn: Patricia Gilligan)
     William A. Broughman. Esq. (Via Facsimile)



# EXHIBIT / ATTACHMENT



(To be scanned in place of tab)

# PURCHASE AND SALE AGREEMENT



2002 Printing

Date: _____ June 8 _____, 2004

1. **Purchase and Sale.** The undersigned buyer ("Buyer") agrees to buy and the undersigned seller ("Seller") agrees to sell all that tract or parcel of land, with such improvements as are located thereon, described as follows: All that tract of land lying and being in Land Lot _____ of the __17__ District, _____ Section of _____Fulton_____ County, Georgia, and being known as Address _____1194 Dawn View Lane_____, City _____Atlanta_____, Georgia Zip Code __30327__, according to the present system of numbering in and around this area, being more particularly described as Lot _____, Block _____, Unit _____, Phase/Section _____ of _____ Subdivision, as recorded in Plat Book _____, Page _____, _____Fulton_____ County, Georgia records together with all fixtures, landscaping, improvements, and appurtenances, all being hereinafter collectively referred to as the "Property." The full legal description of the Property is the same as is recorded with the Clerk of the Superior Court of the county in which the Property is located and is made a part of this Agreement by reference.

2. **Purchase Price and Method of Payment.** Buyer warrants that Buyer will have sufficient cash at closing, which when combined with the loan(s), if any, referenced herein, will allow Buyer to complete the purchase of the Property. Buyer does not need to sell or lease other real property in order to complete the purchase of the Property. The purchase price of the Property to be paid by Buyer at closing is: _____Nine Hundred Thirty Thousand_____ U.S. Dollars, $ 930,000.00 _____ subject to the following: *[Select sections A, B, C, and/or D below. The sections not marked are not a part of this Agreement]*

   ☒ A. All Cash At Closing: Buyer shall pay the purchase price to Seller in cash, or its equivalent. Buyer's obligation to close shall not be subject to any financial contingency. Buyer shall pay all closing costs.

   ☐ B. Loan To Be Assumed: see Exhibit "_____."

   ☒ C. New Loan To Be Obtained: This Agreement is made conditioned upon Buyer's ability to obtain a loan (except if the loan is denied because Buyer lacks sufficient cash to close excluding the amount of the loan and/or because Buyer has not sold or leased other real property) in the principal amount of 75,000 % of the purchase price listed above, with an interest rate at par of not more than 6,000 % per annum on the unpaid balance, to be secured by a first lien security deed on the Property; the loan to be paid in consecutive monthly installments of principal and interest over a term of not less than 30 years. "Ability to obtain" as used herein means that Buyer is qualified to receive the loan described herein based upon lender's customary and standard underwriting criteria. The loan shall be of the type selected below: *[The sections not marked are not a part of this Agreement.]*
   (1) Loan Type: ☒ Conventional; ☐ FHA (see attached exhibit); ☐ VA (see attached exhibit); ☐ OTHER (see attached exhibit)
   (2) Rate Type: ☐ Fixed Rate Mortgage Loan; ☒ Adjustable Rate Mortgage ("ARM") Loan;
   (3) Closing Costs and Discount Points: Seller shall, at the time of closing, contribute a sum not exceed $ 10,000.00 to be used by Buyer to pay for: (a) preparation of the warranty deed and owner's affidavit by the closing attorney; (b) at Buyer's discretion, closing costs, loan discount points, survey costs, and insurance premiums (including flood insurance, if applicable) relating to the Property and/or loan; and (c) at Buyer's discretion, other costs to close including escrow establishment charges and prepaid items, if allowed by lender. Buyer shall pay all other costs, fees, and amounts for the above referenced items and to fulfill lender requirements to otherwise close this transaction.
   (4) Closing Attorney: This transaction shall be closed by the law firm of Lamaa & Zexxaa _____ . provided the firm is approved to close loans for Buyer's lender.
   (5) Loan Obligations: Buyer agrees to: (a) make application for the loan within _____3_____ days from the Binding Agreement Date; (b) immediately notify Seller of having applied for the loan and the name of the lender; and (c) pursue qualification for and approval of the loan diligently and in good faith. Should Buyer not timely apply for the loan, Seller may terminate the Agreement if Buyer does not, within five days after receiving written notice thereof, cure the default by providing Seller with written evidence of loan application. Buyer agrees that a loan with terms consistent with those described herein shall satisfy this loan contingency. Buyer may also apply for a loan with different terms and conditions and close the transaction provided all other terms and conditions of this Agreement are fulfilled, and the new loan does not increase the costs charged to the Seller. Buyer shall be obligated to close this transaction if Buyer has the ability to obtain a loan with terms as described herein and/or any other loan for which Buyer has applied and been approved. From the Binding Agreement Date until closing, Buyer shall not intentionally make any material changes in Buyer's financial condition which would adversely affect Buyer's ability to obtain a loan. In the event any application of Buyer for a loan is denied, Buyer shall promptly provide Seller with a letter from the lender denying the loan stating the basis for the loan denial.

   ☐ D. Second Loan to be Obtained, see Exhibit "_____."

3. **Earnest Money.** Buyer has paid to _____Re/Max of Buckhead_____ ("Holder") earnest money of $20,000.00 check, OR $_____ cash, which has been received by Holder. The earnest money shall be deposited in Holder's escrow/trust account (with Holder retaining the interest if the account is interest bearing) within five banking days from the

Copyright© 2002 by Georgia Association of REALTORS®, Inc.                    F20, Purchase and Sale Agreement, Page 1 of 8  01/01/02

RE/MAX of Buckhead 2911 Piedmont Road, Atlanta GA 30305
Phone: 4042334533      Fax: 4042339944      Mike & Brenda Martin      T4732931.ZFX
Produced with ZipForm™ by RE FormsNet, LLC 18025 Fifteen Mile Road, Clinton Township, Michigan 48035, (800) 383-9805

06/16/2004 WED 15:08  [TX/RX NO 7898]  ☒002

Binding Agreement Date and shall be applied toward the purchase price of the Property at the time of closing. In the event any earnest money check is not honored, for any reason, by the bank upon which it is drawn, Holder shall promptly notify Buyer and Seller. Buyer shall have three banking days after notice to deliver good funds to Holder. In the event Buyer does not timely deliver good funds, the Seller shall have the right to terminate this Agreement upon written notice to the Buyer. Holder shall disburse earnest money only as follows: (a) upon the failure of the parties to enter into a binding agreement; (b) at closing; (c) upon a subsequent written agreement signed by all parties having an interest in the funds; (d) upon order of a court or arbitrator having jurisdiction over any dispute involving the earnest money; or (e) upon a reasonable interpretation of this Agreement by Holder. Prior to disbursing earnest money pursuant to a reasonable interpretation of this Agreement, Holder shall give all parties fifteen days notice, stating to whom the disbursement will be made. Any party may object in writing to the disbursement, provided the objection is received by Holder prior to the end of the fifteen day notice period. All objections not raised in a timely manner shall be waived. In the event a timely objection is made, Holder shall consider the objection and shall do one or more of the following: (a) hold the earnest money for a reasonable period of time to give the parties an opportunity to resolve the dispute; (b) disburse the earnest money and so notify all parties; and/or (c) interplead the earnest money into a court of competent jurisdiction. Holder shall be reimbursed for and may deduct from any funds interpleaded its costs and expenses, including reasonable attorneys' fees. The prevailing party in the interpleader action shall be entitled to collect from the other party the costs and expenses reimbursed to Holder. No party shall seek damages from Holder (nor shall Holder be liable for the same) for any matter arising out of or related to the performance of Holder's duties under this earnest money paragraph. If Buyer breaches Buyer's obligations or warranties herein, Holder may pay the earnest money to Seller by check, which if accepted and deposited by Seller, shall constitute liquidated damages in full settlement of all claims of Seller. It is agreed to by the parties that such liquidated damages are not a penalty and are a good faith estimate of Seller's actual damages, which damages are difficult to ascertain.

4.  **Closing and Possession.**
    A.  Property Condition: Seller warrants that at the time of closing or upon the granting of possession if at a time other than at closing, the Property will be in substantially the same condition as it was on Binding Agreement Date, except for normal wear and tear, and changes made to the condition of the Property pursuant to the written agreement of Buyer and Seller. Seller shall deliver Property clean and free of debris at time of possession. If the Property is destroyed or substantially damaged prior to closing, Seller shall promptly notify Buyer of the amount of insurance proceeds available to repair the damage and whether Seller will complete repairs prior to closing. Buyer may terminate this Agreement not later than five days after receiving such notice by giving written notice to Seller. If Buyer does not terminate this Agreement, Buyer shall receive at closing such insurance proceeds as are paid on the claim which are not spent to repair the damage.
    B.  Taxes: Real estate taxes on said Property for the calendar year in which the sale is closed shall be prorated as of the date of closing. Seller shall pay State of Georgia property transfer tax.
    C.  Timing of Closing and Possession: This transaction shall be closed on _____July 30_____, __2004____, or on such other date as may be agreed to by the parties in writing, provided, however, that: (1) in the event the loan described herein is unable to be closed on or before said date; or (2) Seller fails to satisfy valid title objections, Buyer or Seller may, by notice to the other party (which notice must be received on or before the closing date), extend this Agreement's closing date and the date for surrender of occupancy if later than the closing date, up to seven days from the above-stated closing date. Buyer agrees to allow Seller to retain possession of the Property through: [Select section A, B or C below. The sections not marked are not part of this Agreement.]
        ☒ A. the closing; or ☐ B. _____ hours after the closing; or ☐ C. _____ days after the closing at _____ m. o'clock.
    D.  Warranties Transfer: Seller agrees to transfer to Buyer, at closing, subject to Buyer's acceptance thereof, Seller's interest in any manufacturer's warranties, service contracts, termite bond or treatment guarantee and/or other similar warranties which, by their terms, may be transferable to Buyer.
    E.  Prorations: Seller and Buyer agree to prorate all utility bills between themselves, as of the date of closing (or the day of possession of the Property by the Buyer, whichever is the later) which are issued after closing and include service for any period of time the Property was owned/occupied by Seller or any other person prior to Buyer.
    F.  Closing Certifications: Buyer and Seller shall execute and deliver such certifications, affidavits, and statements as are required at closing to meet the requirements of the lender and of federal and state law.

5.  **Title.**
    A.  Warranty. Seller warrants that, at the time of closing, Seller will convey good and marketable title to said Property by general warranty deed, subject only to: (1) zoning; (2) general utility, sewer, and drainage easements of record on the Acceptance Date upon which the improvements do not encroach; (3) subdivision and/or condominium declarations, covenants, restrictions, and easements of record on the Acceptance Date; and (4) leases and other encumbrances specified in this Agreement. Buyer agrees to assume Seller's responsibilities in any leases specified in this Agreement.
    B.  Examination. Buyer may, prior to closing, examine title and furnish Seller with a written statement of objections affecting the marketability of said title. If Seller fails to satisfy valid title objections prior to closing or any extension thereof, then Buyer may terminate the Agreement upon written notice to Seller, in which case Buyer's earnest money shall be returned. Good and marketable title as used herein shall mean title which a title insurance company licensed to do business in Georgia will insure at its regular rates, subject only to standard exceptions.
    C.  Survey. Any survey of the Property attached hereto by agreement of the parties prior to the Binding Agreement Date shall be a part of this Agreement. Buyer shall have the right to terminate this Agreement upon written notice to Seller if a new survey performed by a surveyor licensed in Georgia is obtained which is materially different from any attached survey with respect to the Property, in which case Buyer's earnest money shall be returned. The term "materially different" shall not apply to any improvements constructed by Seller in their agreed-upon locations subsequent to Binding Date Agreement. Matters revealed in said survey shall not relieve the warranty of title obligations of Seller referenced above.

6.  **Seller's Property Disclosure.** Seller's Property Disclosure Statement is attached hereto and incorporated herein. Seller warrants that to the best of Seller's knowledge and belief, the information contained therein is accurate and complete as of the Binding Agreement Date.

Copyright© 2002 by Georgia Association of REALTORS®, Inc.    F20, Purchase and Sale Agreement, Page 2 of 5 01/01/02
Produced with ZipForm™ by RE FormsNet, LLC 18025 Fifteen Mile Road, Clinton Township, Michigan 48035  (800) 383-9805    T473301.ZFX

7. **Termite Letter.** An official Georgia Wood Infestation Report ("Report") prepared by a licensed pest control operator, covering each dwelling and garage on the Property and dated within one hundred eighty days of the acceptance date is ☐, OR, is not ☐ attached to this Agreement as an exhibit. If the Report is not attached, Seller shall provide such a Report to Buyer within seven days from the Binding Agreement Date. Buyer shall have the right to terminate this Agreement within ten days from the Binding Agreement Date if either of the following events occur: (a) the Report is not timely provided to Buyer; or (b) the Report provided after the Binding Agreement Date indicates present infestation of, or damage to, the Property from termites or other wood destroying organisms. If Buyer does not timely give Seller notice of Buyer's decision to terminate this Agreement, Buyer's right to terminate the Agreement pursuant to this paragraph shall be waived. Notwithstanding the above, Buyer shall continue to have whatever other rights to terminate this Agreement, if any, that exist elsewhere in this Agreement. Unless otherwise noted on the Seller's Property Disclosure Statement, to the best of Seller's knowledge, the information contained in any attached or later provided Report is accurate and complete, and no other termite inspections have been performed or reports issued, the findings of which are inconsistent with the Report attached hereto. Prior to closing, Seller shall treat active infestation of termites and other wood destroying organisms, if any. At closing, Seller shall provide Buyer with a Report prepared by a licensed pest control operator dated within thirty days of the closing, stating that each dwelling and garage has been found to be free from active infestation of termites and other wood destroying organisms. This paragraph shall not limit Buyer's right to request that Seller repair and/or replace defects resulting from termites and other wood destroying organisms if the Property is sold with the right to request repairs in accordance with the Inspection Paragraph herein.

8. **Inspection.** Buyer and/or Buyer's representatives shall have the right to enter the Property at Buyer's expense and at reasonable times (including immediately prior to closing) to thoroughly inspect, examine, test and survey the Property. This shall include the right to inspect and test for lead-based paint and lead-based paint hazards for not less than ten days from the Binding Agreement Date. Seller shall cause all utility services and any pool, spa, and similar items to be operational so that Buyer may complete all inspections under this Agreement. The Buyer agrees to hold the Seller and all Brokers harmless from all claims, injuries, and damages arising out of or related to the exercise of these rights.

*[Select section A or B below. The section not marked shall not be part of this Agreement.]*

Buyer(s) Initials **A. Property Sold With Right to Request Repairs.**

(1) Buyer shall have the right to request that Seller repair and/or replace only defects in the Property identified by Buyer's representative(s) by providing Seller, within ___11___ days from Binding Agreement Date, with a copy of inspection report(s) and a signed written amendment to this Agreement setting forth the defects noted in the report which Buyer requests be repaired and/or replaced. The term "defects" shall mean any portion of or item in the Property which: (a) is not in good working order and repair (normal wear and tear excepted); (b) constitutes a violation of applicable laws, governmental codes or regulations and is not otherwise grandfathered; or (c) is in a condition which represents a significant health risk or an unreasonable risk or injury or damage to persons or property. If Buyer does not timely present the written amendment and inspection report, Buyer shall be deemed to have accepted the Property "as is" in accordance with paragraph B below.

(2) If Buyer timely submits the inspection report and the written amendment, Buyer and Seller shall have ___12___ days (hereinafter "Defect Resolution Period") from the Binding Agreement Date to negotiate through written offers and counteroffers the defects to be repaired and/or replaced by Seller.

(3) Neither party may terminate this Agreement prior to the end of the Defect Resolution Period due to the failure to agree on the repair and/or replacement of defects without the written consent of the other party.

(4) If Seller at any time during the Defect Resolution Period notifies Buyer that Seller will repair and/or replace all of the defects listed in the initial amendment submitted by Buyer, an agreement on the repair and/or replacement of defects shall be deemed to have been reached and all parties shall execute an amendment to that effect.

(5) If Buyer and Seller have not within the Defect Resolution Period agreed on the defects to be repaired and/or replaced by signing a written amendment to this Agreement, Buyer may either accept the last unexpired counteroffer of Seller or accept the Property "as is" in accordance with paragraph B below, by giving notice to Seller within three days after the end of the Defect Resolution Period. If Buyer fails to timely give this notice, this Agreement shall terminate immediately, and Buyer's earnest money shall be returned in accordance with the Earnest Money paragraph above. All agreed-upon repairs and replacements shall be completed in a good and workmanlike manner prior to closing.

OR

Buyer(s) Initials **B. Property Sold "As Is."** All parties agree that the Property is being sold "as is," with all faults including but not limited to lead-based paint and lead-based paint hazards and damage from termites and other wood destroying organisms. The Seller shall have no obligation to make repairs to the Property.

9. **Other Provisions.**

A. **Binding Effect, Entire Agreement, Modification, Assignment:** This Agreement shall be for the benefit of, and be binding upon, Buyer and Seller, their heirs, successors, legal representatives and permitted assigns. This Agreement constitutes the sole and entire agreement between the parties hereto and no modification or assignment of this Agreement shall be binding unless signed by all parties to this Agreement. No representation, promise, or inducement not included in this Agreement shall be binding upon any party hereto. Any assignee shall fulfill all the terms and conditions of this Agreement.

B. **Survival of Agreement.** All conditions or stipulations not fulfilled at the time of closing shall survive the closing until such time as the conditions or stipulations are fulfilled.

C. **Governing Law.** This Agreement may be signed in multiple counterparts, is intended as a contract for the purchase and sale of real property and shall be interpreted in accordance with the laws of the State of Georgia.

Copyright© 2001 by Georgia Association of REALTORS®, Inc.                F20, Purchase and Sale Agreement, Page 3 of 5  01/01/02

Produced with ZipForm™ by RE FormsNet, LLC 18025 Fifteen Mile Road, Clinton Township, Michigan 48035, (800) 383-9805         TXT32901.ZFX

D. **Time of Essence:** Time is of the essence of this Agreement.

E. **Terminology:** As the context may require in this Agreement: (1) the singular shall mean the plural and vice versa; and (2) all pronouns shall mean and include the person, entity, firm, or corporation to which they relate.

F. **Responsibility to Cooperate:** All parties agree to timely take such actions and produce, execute, and/or deliver such information and documentation as is reasonably necessary to carry out the responsibilities and obligations of this Agreement.

G. **Notices:** Except as otherwise provided herein, all notices, including offers, counteroffers, acceptances, amendments and demands, required or permitted hereunder shall be in writing, signed by the party giving the notice and delivered either: (1) in person, (2) by an overnight delivery service, prepaid, (3) by facsimile transmission (FAX) (provided that an original of the notice shall be promptly sent thereafter if so requested by the party receiving the same) or (4) by the United States Postal Service, postage prepaid, registered or certified return receipt requested. The parties agree that a faxed signature of a party constitutes an original signature binding upon that party. Notice shall be deemed to have been given as of the date and time it is actually received. Notwithstanding the above, notice by FAX shall be deemed to have been given as of the date and time it is transmitted if the sending FAX produces a written confirmation with the date, time and telephone number to which the notice was sent. Receipt of notice by the Broker representing a party as a client shall be deemed to be notice to that party for all purposes herein, except in transactions where the Broker is practicing designated agency, in which case, receipt of notice by the designated agent representing a party as a client shall be required to constitute notice. All notice requirements referenced herein shall be strictly construed.

10. **Disclaimer.** Buyer and Seller acknowledge that they have not relied upon any advice, representations or statements of Brokers and waive and shall not assert any claims against Brokers involving the same. Buyer and Seller agree that Brokers shall not be responsible to advise Buyer and Seller on any matter including but not limited to the following: any matter which could have been revealed through a survey, title search or inspection of the Property; the condition of the Property, any portion thereof, or any item therein; building products and construction techniques; the necessity or cost of any repairs to the Property; hazardous or toxic materials or substances; termites and other wood destroying organisms; the tax or legal consequences of this transaction; the availability and cost of utilities or community amenities; the appraised or future value of the Property; any condition(s) existing off the Property which may affect the Property; the terms, conditions and availability of financing; and the uses and zoning of the Property whether permitted or proposed. Buyer and Seller acknowledge that Brokers are not experts with respect to the above matters and that, if any of these matters or any other matters are of concern to them, they should seek independent expert advice relative thereto. Buyer further acknowledges that in every neighborhood there are conditions which different buyers may find objectionable. Buyer shall therefore be responsible to become fully acquainted with neighborhood and other off site conditions which could affect the Property.

11. **Agency and Brokerage.**

A. **Agency.**

(1) In this Agreement, the term "Broker" shall mean a licensed Georgia real estate broker or brokerage firm and where the context would indicate the broker's affiliated licensees. No Broker in this transaction shall owe any duty to Buyer or Seller greater than what is set forth in their brokerage engagements and the Brokerage Relationships in Real Estate Transactions Act, O.C.G.A. § 10-6A-1 et. seq.;

(2) Seller and Buyer acknowledge that if they are not represented by a Broker they are each solely responsible for protecting their own interests, and that Broker's role is limited to performing ministerial acts for that party.

(3) The Broker, if any, working with the Seller is identified on the signature page as the "Listing Broker"; and said Broker is ☒ , OR, is NOT ☐ representing the Seller;

(4) The Broker, if any, working with the Buyer is identified on the signature page as the "Selling Broker"; and said Broker is ☒ , OR, is NOT ☐ representing the Buyer; and

(5) If Buyer and Seller are both being represented by the same Broker, a relationship of either designated agency ☐ , OR, dual agency ☐ shall exist.

   (a) **Dual Agency Disclosure.** [Applicable only if dual agency has been selected above] Seller and Buyer are aware that Broker is acting as a dual agent in this transaction and consent to the same. Seller and Buyer have been advised that:
   1 - In serving as a dual agent the Broker is representing two clients whose interests are or at times could be different or even adverse;
   2 - The Broker will disclose all adverse, material facts relevant to the transaction and actually known to the dual agent to all parties in the transaction except for information made confidential by request or instructions from another client which is not otherwise required to be disclosed by law;
   3 - The Buyer and Seller do not have to consent to dual agency; and
   4 - The consent of the Buyer and Seller to dual agency has been given voluntarily and the parties have read and understood their brokerage engagement agreements.
   5 - Notwithstanding any provision to the contrary contained herein, Seller and Buyer each hereby direct Broker, while acting as a dual agent, to keep confidential and not reveal to the other party any information which could materially and adversely affect their negotiating position.

   (b) **Designated Agency Assignment.** [Applicable only if the designated agency has been selected above]
   The Broker has assigned _____ to work exclusively with Buyer as Buyer's designated agent and _____ to work exclusively with Seller as Seller's designated agent. Each designated agent shall exclusively represent the party to whom each has been assigned as a client and shall not represent in this transaction the client assigned to the other designated agent.

Copyright© 2003 by Georgia Association of REALTORS®, Inc.          F20, Purchase and Sale Agreement, Page 4 of 8  01/01/03

Produced with ZipForm™ by RE FormsNet, LLC 18025 Fifteen Mile Road, Clinton Township, Michigan 48035, (800) 383-9805          T477793:ZFX

06/16/2004 WED 15:08  [TX/RX NO 7898]  ☑005

(c) **Material Relationship Disclosure.** The Broker and/or affiliated licensees have no material relationship with either client except as follows: _____
(A material relationship means one actually known of a personal, familial or business nature between the Broker and affiliated licensees and a client which would impair their ability to exercise fair judgment relative to another client.)

B. **Brokerage.** The Broker(s) identified herein have performed valuable brokerage services and are to be paid a commission pursuant to a separate agreement or agreements. Unless otherwise provided for herein, the Listing Broker will be paid a commission by the Seller, and the Selling Broker will receive a portion of the Listing Broker's commission pursuant to a cooperative brokerage agreement. The closing attorney is directed to pay the commission of the Broker(s) at closing out of the proceeds of the sale. If the sale proceeds are insufficient to pay the full commission, the party owing the commission will pay any shortfall at closing. If more than one Broker is involved in the transaction, the closing attorney is directed to pay each Broker their respective portion of said commission. In the event the sale is not closed because of Buyer's and/or Seller's failure or refusal to perform any of their obligations herein, the non-performing party shall immediately pay the Broker(s) the full commission the Broker(s) would have received had the sale closed, and the Selling Broker and Listing Broker may jointly or independently pursue the non-performing party for their portion of the commission.

12. **Time Limit of Offer.** This instrument shall be open for acceptance until ___6:00___ o'clock ___P.___ M. on the ___10th___ day of _____ June _____, 2004.

13. **Exhibits and Addenda.** All exhibits and/or addenda attached hereto, listed below, or referenced herein are made a part of this Agreement. If any such exhibit or addendum conflicts with any preceding paragraph, said exhibit or addendum shall control: Bill of Sale

SPECIAL STIPULATIONS: The following Special Stipulations, if conflicting with any exhibit, addendum, or preceding paragraph, shall control.
1. Buyer warrants that this Agreement is not contingent upon the sale of current residence or any other property and further states that failure to sell any of said properties will not be grounds for refund of earnest money in the event of loan denial.

2. Sale subject to approval by United States District Court in the matter of SEC v. S. Scott Erkind, etal, Civil Action No. 1-02-CV-2429 MHS. The Special Master appointed in this matter will file a motion seeking approval of sale by June 16, 2004.

☐ (Mark box if additional pages are attached.)

Re/Max of Buckhead ( RMBM01 )
Selling Broker                    MLS Office Code
By: _____
Broker or Broker's Affiliated Licensee
Print or Type Name: Michael G. Martin
Bus. Phone: (404) 760-8827   FAX # (404) 262-2847
Multiple Listing # 225390

Harry Norman Realtors ( HNRH11 )
Listing Broker                    MLS Office Code
By: _____
Broker or Broker's Affiliated Licensee
Print or Type Name: Ethel M. Wotton
Bus. Phone: (404) 233-4142   FAX # (404) 365-0026

Buyer's Signature: _____   SS/FEI#
Print or Type Name: Jan Kerner
Buyer's Signature: _____   SS/FEI#
Print or Type Name: Vandana Kerner

Seller's Signature: _____   SS/FEI#
Print or Type Name: S. Gregory Hays
Special Master for estate of S. Scott Erkind
Seller's Signature: _____   SS/FEI#
Print or Type Name: _____

**Acceptance Date**
The above proposition is hereby accepted, __12:35__ o'clock __P__ m. on the __12__ day of __June__.
**Binding Agreement Date**
This instrument shall become a binding agreement on the date ("Binding Agreement Date") when notice of the acceptance of this Agreement has been received by offeror. The offeror shall promptly notify offeree when acceptance has been received.

Copyright 2003 by Georgia Association of REALTORS, Inc.          F20, Purchase and Sale Agreement, Page 5 of 5 01/01/03
Produced with ZipForm™ by RE FormsNet, LLC 18025 Fifteen Mile Road, Clinton Township, Michigan 48035, (800) 383-9805          T4732P3127X



**2002 Printing**

# PERSONAL PROPERTY AGREEMENT
## (BILL OF SALE)

Date: _____ June 8 _____ , 2004 .

State of Georgia
County of _____ Fulton _____

For and in consideration of the sum of One Dollar ($1.00) in hand paid, receipt of which is hereby acknowledged, I agree to sell to the undersigned Buyer the following personal property hereinafter described:

## ~~PERSONAL PROPERTY~~

| ITEM | DESCRIPTION | PRICE |
|---|---|---|
| 1 | All Window Treatments | 1.00 |
| 2 | All Light Fixtures | 1.00 |
| 3 | All kitchen appliances excluding refrigerator | 1.00 |
| 4 | Garage door openers | 1.00 |
| 5 | Fireplace inserts and gas logs | 1.00 |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  | TOTAL $ | 5.00 |

1. This Bill of Sale shall become operative only upon the consummation of the Purchase and Sale Agreement, with an Offer Date of _____ June 8 _____ , 2004 _____ , covering the real property located at: 1184 Dawn View Lane, Atlanta, GA 30327
Buyer shall then have all rights and title to the property and such rights shall inure to his or her respective executors, administrators, heirs or assigns. If for any reason whatsoever, the sale is not consummated, then this Bill of Sale covering personal property herein described shall be null and void and the consideration paid for this Bill of Sale shall be returned to the undersigned Buyer.

2. Seller warrants that Seller is the lawful owner of the personal property and states the personal property is free from all liens and encumbrances of any kind whatsoever. Seller further warrants that Seller has the right to sell the personal property and will warrant and defend the right against the lawful claims and demands of all persons.

Buyer's Signature _____  SS/FEI # _____
Print or Type Name: Jan Kerner _____

Buyer's Signature _____  SS/FEI # _____
Print or Type Name: Vandana Kerner _____

Seller's Signature ___ Special Martr ___  SS/FEI # _____
Print or Type Name: S. Goltogly Hayr _____

Special Mark in Care of J. Scott Etkin
Seller's Signature _____  SS/FEI # _____
Print or Type Name: _____

Copyright 2002 by Georgia Association of REALTORS®, Inc.             F134, Personal Property Agreement (Bill of Sale) 01/01/02

RE/MAX of Buckhead 2911 Piedmont Road, Atlanta GA 30305
Phone: 4042134633      Fax: 4042339944      Mike & Brenda Martin                           T4732931.ZFX
Produced with ZipForm™ by RE FormsNet, LLC 18025 Fifteen Mile Road, Clinton Township, Michigan 48035, (800) 383-9805



# EXHIBIT / ATTACHMENT

## C

(To be scanned in place of tab)

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

SECURITIES AND EXCHANGE
COMMISSION,

      Plaintiff,

v.

J. SCOTT ESKIND; LORUS
INVESTMENTS, INC.; and
CAPITAL MANAGEMENT FUND,
LIMITED PARTNERSHIP,

      Defendants.

Civil Action No. 1-02-CV-2429-MHS

## ORDER TO SHOW CAUSE

The Special Master appointed pursuant to the Final Judgment entered by this Court on January 20, 2004 having filed a Motion for (A) Authority to Sell Residence of J. Scott Eskind Free and Clear of Lien; (B) to Determine Secured Claim; (C) to Surcharge Collateral of Mortgage Holder and (D) requests for Hearing prior to July 30, 2004 any party asserting any interest in the Residence as defined in the Motion is hereby ordered to show cause as to why the requested relief should not be granted. The Court has scheduled a hearing to be held at ___, on _____, 2004. All briefs, affidavits and other papers in support of or in opposition to said motion shall be filed and served on or before _____, 2004.

-2-

IT IS SO ORDERED this _____ day of May, 2004.

_____
Marvin H. Shoob, Judge
United States District Court
for the Northern District of Georgia

This Order Prepared and
Submitted by:

MCKENNA LONG & ALDRIDGE LLP

By:_____
Henry F. Sewell, Jr.
Ga. Bar I.D. No. 636265

Suite 5300
303 Peachtree Street
Atlanta, Georgia 30308
404-527-8120 (phone)
404-527-4198 (fax)

Attorneys for the Special Master

ATLANTA:4645345.1

## CERTIFICATE OF SERVICE

I hereby certify that have served the foregoing SPECIAL MASTER'S

MOTION FOR AUTHORITY TO RESIDENCE OF J. SCOTT ESKIND *upon the*

persons listed below by causing copies of the same  to be placed in the United

States mail, first-class postage prepaid.

William P. Hicks, Esq.
Securities & Exchange Commission
3475 Lenox Road, N.E.
Suite 1000
Atlanta, GA 30326-1232

J. Scott Eskind
FCI Jesup
2600 Highway 301 South
Jesup, Georgia 31599
Bruce S. Harvey, Esq.
Office of Bruce S. Harvey
146 Nassau Street, NW
Atlanta, GA 30303-2009

Richard A. Epstein, Esq.
2 Bucks Lane& Hwy. 79, Suite 3
Marlboro, N.J.  07746
Attorney for Emigrant Mortgage

Office of Howard Adam Becker
c/o William C. McFee, Jr., Esq.
Schulten Ward & Turner, LLP
Suite 2700
260 Peachtree Street, N.W.
Atlanta, GA 30303

John Russell Phillips, Esq.
Office of United States Attorney
Northern District of Georgia
75 Spring Street, S.W.
600 United States Courthouse
Atlanta, GA 30335

Emigrant Mortgage Company, Inc.
7 Westchester Plaza
Elmsford, N.Y  10523

This 16th day of June, 2004:

Henry F. Sewell, Jr.
Georgia Bar No. 636265

-11-

ATLANTA:4652753.1